## Brewington, et al. v. Commonwealth.

(Decided September 28, 1923.)

### Appeal from Warren Circuit Court.

1. Homicide—Whether Defendants Were Present at Time of Shooting Properly Submitted to Jury.—In prosecution for malicious shooting with intent to kill the owner of a storehouse, which was being broken into in the night, whether defendants were the persons who were attempting to break into the storehouse and who fired the shots held properly submitted to the jury.

2. Homicide—Offense of Shooting in Sudden Affray or Sudden Heat Held not Involved in Prosecution for Malicious Shooting to Kill.—In a prosecution for malicious shooting with intent to kill where

the uncontradicted evidence was that persons were attempting to commit a felony by breaking into a store, and, when complaining witness interrupted them in the commission of that crime by firing at them they returned that fire for the plain and unmistakable pur-pose of enabling them to escape, the court did not err in failing to submit to the jury the offense of shooting at another in sudden affray or in sudden heat and passion without previous malice, described in Kentucky Statutes, section 1242, though such an offense is a degree of the offense described in section 1166.

3.  Homicide—Evidence Held to Warrant Finding that all Defendants Fired with Intent to Kill.—In a prosecution for malicious shooting at another with intent to kill, under an indictment charging three defendants with being principals, but not charging conspiracy, held that it could not be argued that, as only two pistols were found on the ground, at least one of the three defendants was wrongly convicted as a principal; the prosecuting witness testifying that defendants fired a number of shots.

THURMAN B. DIXON and OLIVER & DIXON for appellants.

THOS. B. McGREGOR, Attorney General, and LILBURN PHELPS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER— Affirming.

Appellants, Virgil Brewington, Henry Brewington and E. E. Hanna, were jointly indicted, charged with malicious shooting at with intent to kill Euclid Hardcastle without wounding him, under the provisions of section 1166, Kentucky Statutes.

They were each found guilty on their joint trial and sentenced to confinement in the penitentiary for a period of three years, and from the judgment on that verdict they have appealed.

A short statement of the evidence is necessary to the end that the questions raised may be understood.

The two Brewingtons were young men who each stayed in Bowling Green, but their father was a farmer and lived on the Scottsville pike several miles from Bowling Green; Hanna was a friend and associate of the Brewington boys, and at times went to the home of the elder Brewington with them and occasionally did work on the latter's farm. They were each engaged in the illicit liquor traffic, and a day or two before the occurrences herein considered met for the first time in Bowling Green a man by the name of King, a stranger there. The latter appears, also, to have been engaged in the liquor traffic,

and to have had with him a Ford machine upon which there was an Indiana license tag. King, doubtless having information appellants were engaged in the liquor traffic, proposed to them the exchange of red whiskey, which he claimed to have, for white whiskey he thought appellants had, and at the same time expressed a desire to get in touch with the producers of white whiskey so that he might make red whiskey therefrom by a process he claimed to have. The parties agreed upon the exchange of white and red whiskey and agreed to leave on Tuesday night, May 2nd, and go to a point near Red Boiling Springs in Tennessee and procure the white whiskey, and then return to Bowling Green or its vicinity and make the exchange. King was to accompany appellants on this trip in his car with the Indiana license tag, and appellants were to make the trip in their own car, owned by one or both of the Brewingtons.

Accordnigly on that night the parties left for Red Boiling Springs, King having preceded the others, but they met at a point near Scottsville in Allen county. Thence they proceeded to the objective point in Tennessee, which they reached early the following morning. They remained throughout that day in the vicinity, procured twenty-four gallons of white whiskey, and about night-fall started on the return trip to Bowling Green, King in his car and appellants and the whiskey in the Brewington car.

About twelve o'clock or twelve-thirty on that night they reached a point not far from the home of the elder Brewington, and there the whiskey was unloaded from the Brewington car, placed in sacks and sunk in a nearby pond. Virgil Brewington and King are then said to have driven the two cars into Bowling Green for the purpose of meeting at a point near there the parties from whom King was to get the red whiskey with which to make the exchange, and they were then to take the latter back to the point where they had left Henry Brewington and Hanna, and there complete the deal. It appears that Virgil Brewington, when he reached Bowling Green in the Brewington car, placed the car in the place where it usually stayed, at or near the boarding house of Henry Brewington. Then Virgil and King went, presumably in King's car, to the point near Bowling Green where King was to meet the parties with the red whiskey. They failed, however, to find the parties or the whiskey, and

then returned to the point where they had left Henry and Hanna and so reported to them. King, however, appellants say, claimed that there was a point on the Louisville and Nashville pike where he thought he could find the parties with the red whiskey, and he accordingly left the other three and started for that point with the understanding that he would be gone an hour or two, at which time he expected to return with the red whiskey. This was about one or one-thirty a. m. on the morning of May 4th. After King left the second time the three appellants claim they went to the nearby home of the elder Brewington for the purpose of getting something to eat, and remained there an hour and a half or longer, when they returned to the meeting point for the purpose of meeting King again. The latter, however, never did return and has never been seen or heard of since, according to the statement of appellants.

Euclid Hardcastle is a country merchant who lives about seven miles from Bowling Green on another pike, but only about 3½ or 4 miles from the point near the elder Brewington's house where appellants and King are supposed to have separated the last time. Hardcastle's home is only a short distance from his storehouse where his mercantile business is conducted, and about two-thirty on that morning he was aroused by some noise or commotion at the storehouse. He dressed hastily, took his shot gun and proceeded to a point somewhere between his home and the storehouse. The latter had double doors at the front, and a porch or platform. He heard noises on the platform and saw a light, presumably from a flash light, moving up and down the crack between the double doors, but could not distinguish any person or persons or their outlines. He, however, fired two shots at the light, his shells being loaded either with B.B. shot or smaller ones. Immediately his fire was returned by pistol shots, six to ten in number, part of the shots being from heavier caliber weapons than the others. The parties at the door then separated, some of them going in one direction and some in another; but Hardcastle does not claim to have recognized any of them, or even to have seen anything more than the flash of the pistols when the firing was done.

After the parties had left and the firing was over, it was found that a lock and a catch on the storeroom door had been broken; two pistols had been dropped or thrown

away, one 45 caliber and the other 32; there was evidence that some one had fallen from the porch or platform, and near there was found a light colored cap, a flash light, a pinch bar, a sledge hammer and a screw driver, and the store doors had been prized on presumably with one or more of these instruments. In addition to these articles so left behind, a short distance from the storehouse was found a Ford car with an Indiana license tag on it, headed toward Bowling Green. In that car was an overcoat with a fur collar, and a raincoat. The overcoat is identified as the property of the son of Henry Brewington's boarding house keeper, and it is admitted by him that he borrowed the same before he started on the trip to Tennessee. Neither the raincoat, the cap, the pistols nor any of the other things found there are identified as the property of any one; but it is shown in evidence that some time the following day a stranger who was limping and bareheaded appeared at a home in that locality and was given a cap. He was walking with a stick and "could hardly go," but the witness states that man was neither of these three defendants.

Within a few minutes after the shooting Hardcastle's grown daughter left the place in a Buick machine and drove rapidly to Bowling Green to notify the authorities. She there found an officer to whom she related the occurrence, and the officer, after making some preliminary examination around the city to see whether he could locate any suspicious persons, then drove with Miss Hardcastle out the Scottsville pike toward the direction of the elder Brewington's home. At about four-thirty o'clock that morning and just about daybreak they came to the intersection of the Lovers' Lane pike with the Scottsville pike and there they found in the road Henry Brewington and Hanna. The point appears to be about 3½ or 4 miles from the storehouse of Hardcastle, and this meeting was about two hours or possibly a little less since the shooting at the storehouse.

The officer talked to the two men but did not disclose to them the purpose of his visit. The party in the machine then proceeded on the Lovers' Lane pike, and some distance from where they had met the other two they met Virgil Brewington. They stopped and talked to him also, but still did not disclose the purpose of their trip.

There was likewise evidence that during the day officers and others secured the shoes worn by each of ap-

pellants on the night before and fitted them into certain tracks discovered between the point where they were seen at 4:30 that morning and the store house; but this attempt at backtracking was very unsatisfactory, and it was only at certain places where the earth was soft that such tracks were found, and was not followed to a point nearer than about a mile from the Hardcastle store where it was abandoned because of a hard rain. On the whole, we attach little importance to this track evidence, because it was not done until the afternoon after the shooting and was unsatisfactory because of the lack of continuity in following the tracks. This evidence was competent, and may have been enlightening to the jury, but because of the lack of a map of that section, and the want of knowledge of the relationship between the various localities referred to in the evidence and the directions which the several roads ran, we cannot see the full force of it.

The defendants each testified that they had made the trip to Tennessee with King, as above recited, and had returned with him; that King and Virgil Brewington had first separated from the other two and taken the two machines to Bowling Green, and that upon their return about one o'clock or later on that night Virgil Brewington remained with them, and King again left in his machine for the purpose of making a further effort to find the parties supposed to have the red whiskey, and that they had never seen him since. In addition Henry Brewington admitted he borrowed the overcoat found in King's machine, but says he borrowed that coat and loaned it to King to wear on the Tennessee trip.

In addition to their testimony it is shown by the evidence of the elder Brewington and his wife, and by the evidence of a young farm hand at their home, that the two Brewington boys and Hanna came to their home that night about one o'clock, or thereabouts, and remained an hour and a half, or longer, and left there about three o'clock. This evidence is largely discredited by rebuttal evidence, showing that each of the elder Brewingtons and the farm hand had made contradictory statements with reference to the presence of the young men at the house that night.

It is true this conviction rests wholly upon circumstantial evidence. No witness recognized these defendants at the place of the shooting, and so far as the direct evidence goes nearer than $3\frac{1}{2}$ to 4 miles, but some of the

circumstances are very weighty, and appear to point to such conclusions as authorized the submission of the case to the jury.

It is admitted by appellants they were with King up to about an hour or so of the occurrence at Hardcastle's store; that King was at the store seems to be convincingly shown by the fact that his machine was left standing there, and by the additional fact that the overcoat, confessedly borrowed by one of those with whom he had made the trip to Tennessee, was found in the car; unmistakably there were more persons than one at the front door of Hardcastle's store, for his evidence shows that while he did not see or recognize them, some of them went one way and some another, and at least two of them were firing at him with different pistols at practically the same time. It is shown that King was a stranger in and about Bowling Green, and it appears to be unreasonable to assume that a stranger in the dead of the night might in so short a time procure confederates in a strange country to aid him in the perpetration of such a crime. If King was at Hardcastle's store, as he must have been, who were his confederates and associates? If they were not the appellants who had confessedly been with him for two nights and a day and up to within an hour or so of the commission of the crime, who could they have been? These circumstances, taken in connection with the admitted fact that Henry Brewington borrowed the overcoat and with the admitted fact that they were all together an hour or so before the shooting, and the further evidence that during the next day a stranger was seen in that locality bareheaded and evidently suffering from a wound, authorized the jury to reach the conclusion that King and these appellants had gone to that storehouse together in King's car, and that King was shot when Hardcastle fired at the flashlight and managed to dodge the authorities, even though he was crippled and bareheaded.

Leaving therefore out of consideration the evidence about the tracks, and taking into the estimate that the attempted alibi was practically destroyed in rebuttal, the case must be said to have been properly submitted on the circumstantial evidence recited.

While it is true that some of the statements of appellants in their evidence remain uncontradicted, unless it be by these facts and circumstances, the credibility of

the witnesses and the truth or falsity of their statements was a matter for the jury alone.

It is also argued that the offense of shooting at in sudden affray or in sudden heat and passion without previous malice described in section 1242, Kentucky Statutes, is a degree of the offense described in 1166, and that therefore the trial court should have given an instruction under that section authorizing a conviction for a misdemeanor only.

It is true that the lesser offense is a degree of the greater, but in this case there was no evidence whatever authorizing the giving of an instruction under section 1242. The uncontradicted evidence is that the parties were attempting to commit a felony by breaking into the storehouse of Hardcastle, and when he interrupted them in the commission of that crime by firing at them, they returned that fire for the plain and unmistakable purpose of enabling them to escape detection or identification and thereby avoid punishment. The sudden affray or sudden heat and passion referred to in section 1242 has reference to a personal difficulty or altercation suddenly arising previous to the shooting, and can in no conceivable way be construed to apply to the firing at one by persons engaged in the commission of a felony in an attempt to conceal their identity or to escape.

The indictment in this case charges each of the three defendants with being principals in the commission of the crime by shooting at Hardcastle with intent to kill him, and there is no charge of conspiracy or that part of them aided and assisted the others in the commission of the crime. It is argued from this that as the evidence only shows that two of the three actually fired at Hardcastle, at least one of the three was wrongfully convicted as a principal. This contention grows chiefly out of a misapprehension of Hardcastle's evidence; he stated that they fired six, eight or ten shots at him, and that after they left he found a 32 caliber Colts pistol and a 45 army pistol, that there was more than one being fired, and that he could tell from the sound that one was a larger caliber than the other, but he does not say that only two pistols were being fired at him. Considering the number of shots fired at him the jury might have believed that at least three or more persons were firing at him, and that two of them were firing pistols of the same caliber. The fact that only two pistols were found on the ground after-

wards is in no sense convincing that they were the only two pistols in the possession of those at the storehouse, or fired by them. Two of them may have had 45s, or two of them may have had 32s.

We see no reason to disturb the verdict.

Judgment affirmed.